UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENISE K. HOUTTEKIER,

          Plaintiff,         Civil Action No. 16-13231
                                 Honorable David M. Lawson
                                 Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 19]**

Plaintiff Denise K. Houttekier ("Houttekier") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [16, 19], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Houttekier is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [19] be DENIED, Houttekier's Motion for Summary Judgment [16] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Recommendation.

## II. REPORT

### A. Procedural History

On March 19, 2014, Houttekier filed an application for SSI, alleging a disability onset date of December 1, 2011.[1] (Tr. 183-89). This application was denied initially on June 16, 2014. (Tr. 127-30). Houttekier filed a timely request for an administrative hearing, which was held on July 23, 2015, before ALJ Paul Sher. (Tr. 69-115). Houttekier, who was represented by non-attorney representative Dannelly Smith, testified at the hearing, as did vocational expert Amy Kutschbach. (*Id.*). On September 8, 2015, the ALJ issued a written decision finding that Houttekier is not disabled under the Act. (Tr. 54-63). On July 12, 2016, the Appeals Council denied review. (Tr. 1-6). Houttekier timely filed for judicial review of the final decision on September 7, 2016. (Doc. #1).

### B. Framework for Disability Determinations

Under the Act, SSI is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

---

[1] At the hearing, Houttekier amended the alleged onset date to March 17, 2014. (Tr. 78, 208).

2

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C. Background**

*1. Houttekier's Reports and Testimony*

At the time of the administrative hearing, Houttekier was 49 years old, and at 5'7" tall, weighed approximately 240 pounds. (Tr. 75, 217). She was divorced and lived in a house with her boyfriend and the youngest of her three children. (Tr. 75-76, 80). She completed high school but had no further education. (Tr. 77, 218). Houttekier testified that she worked at the Salvation Army "for a couple months" in early 2014; aside from that, however, she has very little work history after high school, as she was a stay-at-home mother. (Tr. 78-80).

Houttekier alleges disability primarily as a result of left knee pain, pain in both feet, and poor circulation in the toes on her left foot. (Tr. 82, 217). She has had multiple surgeries on her

left knee – most recently in May of 2013.[2] (Tr. 83-84). She has difficulty sitting or standing for long periods of time and has to sit down on the couch and elevate her leg above waist-level "[e]veryday, all day" because her knee hurts so much. (Tr. 83-85). She takes Norco every six hours for pain. (Tr. 90). At the time of the hearing, she was using a cane, which she indicated was prescribed by her physician. (Tr. 91, 229).

Houttekier can attend to her personal care but does very little in terms of household chores; her days are spent lying on the couch watching television, talking to her boyfriend and son, and playing games on her phone. (Tr. 86, 88, 92, 230). She testified that she can walk only 50 or 60 feet, sit for 30 minutes, and stand for only five minutes at a time. (Tr. 87, 97-98). She takes public transportation to the grocery store with her boyfriend and son once a week, but uses an electric cart while at the store. (Tr. 94-95, 232).

### 2. *Medical Evidence*

The Court has thoroughly reviewed Houttekier's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 3. *Vocational Expert's Testimony*

Amy Kutschbach testified as an independent vocational expert ("VE") at the administrative hearing. (Tr. 106-10). The ALJ asked the VE to imagine a claimant of Houttekier's age, education, and work experience who can perform light work, with the following additional limitations: only occasional balancing, stooping, kneeling, crouching, and crawling; no operation of foot controls; must be able to sit or stand alternatively, at will, provided that she is not off task for more than 20% of the work period; and limited to unskilled

---

[2] The record also indicates that, after the administrative hearing, Houttekier underwent an additional surgery on her left knee, in January 2016. (Tr. 14-15).

work. (Tr. 107). The VE testified that the hypothetical individual would be capable of working in the jobs of repack room worker (300,000 jobs nationally), office helper (50,000 jobs), and wire cutter (5,000 jobs). (Tr. 107-08).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Houttekier is not disabled under the Act. At Step One, the ALJ found that Houttekier has not engaged in substantial gainful activity since March 17, 2014 (the application date). (Tr. 56). At Step Two, the ALJ found that Houttekier has the severe impairments of left patellofemoral arthritis status post-arthroplasty and obesity. (*Id.*). At Step Three, the ALJ found that Houttekier's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 57).

The ALJ then assessed Houttekier's residual functional capacity ("RFC"), concluding that she is capable of performing light work, with the following additional limitations: only occasional balancing, stooping, kneeling, crouching, and crawling; no operation of foot controls; must be able to sit or stand alternatively, at will, provided that she is not off task for more than 20% of the work period; and limited to unskilled work. (Tr. 58).

At Step Four, the ALJ determined that Houttekier has no past relevant work. (Tr. 62). At Step Five, he concluded, based in part on the VE's testimony, that Houttekier is capable of performing a significant number of jobs that exist in the national economy. (Tr. 63). As a result, the ALJ concluded that Houttekier is not disabled under the Act. (*Id.*).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the

court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all

evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

**F.     Analysis**

In her motion, Houttekier argues that the ALJ erred in affording little weight to the June 2015 opinion of her treating physician, Michael Diment, M.D., and in failing to give good reasons – supported by substantial evidence – for discounting that opinion.[3] (Doc. #16 at 10-18). For the reasons set forth below, the Court agrees.

*1.     The Applicable Legal Standard*

Courts have recognized that an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. *Soc. Sec. Rul. 96-2p*, 1996 WL

---

[3] Houttekier also argues that remand is appropriate because the ALJ erred in evaluating the credibility of her subjective complaints. (Doc. #16 at 22-26). Because the Court is recommending remand on other grounds, it need not address the merits of this argument. On remand, however, the ALJ should thoroughly consider Houttekier's subjective complaints.

374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence."). If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion)).

> 2. *The ALJ Did Not Give Good Reasons, Supported by Substantial Evidence, For Discounting the Opinion of Houttekier's Treating Physician*

Primarily at issue is a Physical Residual Functional Capacity Questionnaire completed by Dr. Diment on June 6, 2015.[4] (Tr. 542-45). On that form, Dr. Diment indicated that Houttekier's diagnosis was patellofemoral joint osteoarthritis; that she experienced pain, stiffness, difficulty walking, decreased range of motion, and swelling in both knees; and that her prognosis was "fair/poor." (Tr. 542). Dr. Diment opined that Houttekier could sit for 30 minutes at a time and less than two hours in an eight-hour workday; stand for five minutes at a time and less than two hours in an eight-hour workday; and walk zero blocks. (Tr. 543-44). He further opined that Houttekier needed a sit-stand option, to walk for five minutes every thirty minutes, and to use an assistive device while engaged in occasional standing/walking. (Tr. 544). Dr.

---

[4] Dr. Diment provided two other opinions – one in March 2014 and another in July 2014. In March 2014, Dr. Diment opined that Houttekier was "able to return to work," but could only sit, could not lift over ten pounds, could not stand for more than 60 minutes consecutively, and could not squat, kneel, or climb. (Tr. 275). Similarly, in July 2014, Dr. Diment opined that Houttekier would be limited to "Light Duty Restrictions," including no lifting or carrying over ten pounds, no standing for more than 60 minutes consecutively, and no kneeling, squatting, or climbing. (Tr. 690).

Diment further indicated that, with prolonged sitting, Houttekier's legs should be elevated "if comfortable for [her]." (*Id.*). Dr. Diment also opined that Houttekier could rarely lift and/or carry less than ten pounds; rarely twist; and never stoop, crouch, squat, or climb ladders or stairs. (Tr. 544-45). Finally, Dr. Diment opined that Houttekier's impairments would frequently interfere with the attention and concentration needed to perform even simple work tasks, and that she would miss four or more days of work per month because of her impairments. (Tr. 543, 545).[5] The ALJ considered Dr. Diment's opinion but assigned it "little weight" for several specific reasons, each of which is discussed below.

### a. Inconsistency with Treatment Notes

First and foremost, the ALJ discounted Dr. Diment's June 2015 opinion (as well as those from 2014) because they "infer deterioration in [Houttekier's] condition, yet said deterioration is not reflected in Dr. Diment's treatment notes." (Tr. 60). In support of this statement, the ALJ cites treatment notes from four visits to Dr. Diment, between December 2014 and May 2015, during which Dr. Diment, at various times, indicated that Houttekier "could get up and down from a chair easily using her left leg, that she could walk without a limp, and that she had stable Varus and Valgus stress testing and a stable Lachman test."[6] (Tr. 60 (citing Tr. 490, 590, 599,

---

[5] In contrast to these limitations, "light work," as defined by the regulations, involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds, some pushing or pulling, and standing or walking for a total of approximately six hours in an eight-hour work day, with intermittent sitting during the remaining two hours. *See* 20 C.F.R. § 416.967(b); *Soc. Sec. Rul. 83-10*, 1983 WL 31251, at *6 (Jan. 1, 1983).

[6] The Varus stress test checks for joint laxity on the outside of the knee, which usually represents an injury to the lateral collateral ligament. The Valgus stress test checks for medial joint laxity, which usually represents an injury to the medial collateral ligament. *Knee Physical Examinations*, University of California, San Francisco Medical Center, http://orthosurg.ucsf.edu/patient-care/divisions/sports-medicine/conditions/physical-examination-info/knee-physical-examination/ (last accessed June 8, 2017). The Lachman test checks for evidence of an injury to the anterior cruciate ligament. *Evaluating the Patient with a*

9

603)). The problem, however, is that, despite the existence of these findings on a few occasions, a fair reading of *all* of Dr. Diment's treatment notes from the relevant period of time reveals that Houttekier's condition was in fact deteriorating, contrary to the ALJ's finding.

By way of background, Houttekier underwent arthroscopic left knee surgery and a left knee lateral release and loose body removal in November 2011, after which she did fairly well and was not seen by Dr. Diment for more than one year. (Tr. 655, 677-78). On March 18, 2013, however, Houttekier returned to see Dr. Diment, reporting that she had "just developed an intense swelling in her left knee." (Tr. 655). Dr. Diment noted that she had a probable internal derangement of the left knee, mostly consistent with chondromalacia of the patella, and he aspirated fluid from the knee. (*Id.*). He further indicated that if Houttekier continued to have significant effusion or if it recurred quickly, he "might have to consider repeat diagnostic arthroscopy for her." (*Id.*).

Houttekier returned to Dr. Diment on April 1, 2013, at which time she reported continued pain, had limited range of motion, was walking with a cane, and was uncomfortable on Varus or Valgus stress testing. (Tr. 652). Dr. Diment noted that Houttekier had already undergone five left knee procedures and that he did not want to repeat surgery if it was not necessary. (*Id.*). At her next visit, on April 29, 2013, Dr. Diment noted that Houttekier had symptomatic chondromalacia of the patella, "really early bone-to-bone arthritis in the patellofemoral joint." (Tr. 649). He advised her to consider further surgery and, on June 10, 2013, she underwent a left knee arthrotomy and synovectomy. (Tr. 390, 649).

Following this surgery, Houttekier recovered fairly well for a period of time and, despite a couple of setbacks, seemed to be progressing. (Tr. 633-48). On March 13, 2014, however,

---

*Knee Injury*, American Academy of Family Physicians, http://www.aafp.org/afp/2005/0315/p1169.html (last accessed June 8, 2017).

Houttekier presented to the emergency room with knee pain, after having fallen on ice a few days earlier. (Tr. 298-303). X-rays showed mild tricompartmental joint space narrowing and osteophyte formation, but there was no evidence of fracture or dislocation. (Tr. 304).

Houttekier returned to see Dr. Diment on March 28, 2014, reporting that she recently fell and hyperflexed her left knee. (Tr. 629). On examination, she was "a little swollen," but had "pretty good" range of motion and no instability. (*Id.*). On April 23, 2014, Dr. Diment noted that Houttekier had been "doing well until she fell"; on examination, she had no obvious effusion, good range of motion, and no "real" instability to Varus or Valgus stress testing. (Tr. 634). His impression was that "she has just sustained more of a contusion and aggravated her chondromalacia to her left knee" and that it would improve on its own. (*Id.*). At her next visit, on May 28, 2014, Dr. Diment noted that Houttekier was "progressing" with respect to her left knee, although she had definite weakness in the leg and walked with a cane. (Tr. 620).

On July 18, 2014, however, Dr. Diment noted that Houttekier "continues to have problems with her left knee." (Tr. 616). He then explained that, although she "initially did quite well" after her June 2013 surgery, she had suffered "a little bit of a setback with increasing pain in the knee." (*Id.*). On examination, she had good range of motion, but she also seemed to have an effusion and potentially "a little bit of instability of her patella." (*Id.*). Dr. Diment's impression was that Houttekier had not done as well after her most recent surgery as he had hoped; he suspected that she might be symptomatic "more from a patellofemoral instability and weakness than anything else"; and he encouraged her to exercise and lose weight. (*Id.*).

On September 23, 2014, Houttekier reported continued left knee pain and swelling. (Tr. 612). On examination, she had swelling around the knee, an effusion, "quite a bit of patellar mobility," and "good, but not great quad contraction." (*Id.*). Dr. Diment noted that Houttekier

11

continued to have problems with patellar tendon instability and pain and indicated she would be fitted for a patellar stabilizing brace. (*Id.*).

On November 26, 2014, Houttekier told Dr. Diment that she had recently been seen in the emergency room after falling while getting out of a truck and striking "directly on her knee." (Tr. 607). Dr. Diment again noted that, after her June 2013 surgery, she "seemed to do better … but subsequently she really has not continued to do well." (*Id.*). Houttekier reported pain going up and down stairs and "even when trying to walk normally." (*Id.*). She walked favoring the knee, had poor quad contraction, and had "significant patellofemoral laxity, particularly with the knee relaxed in extension." (*Id.*). Dr. Diment then noted:

> It is my impression that she has had a recent contusion to her knee, which of course has just weakened her leg and made things more difficult for her. **She seems to have developed over time more patellofemoral instability compared to what she had initially after her surgery in 2013.** It is difficult to tell whether or not conversion to a knee replacement or revision realignment would be the best operation. She is certainly very young at 48 to proceed with knee replacement surgery and **prior to this her knee joint had really looked good, just the patellofemoral joint has been the problem.** A patellofemoral joint replacement might be an indication for her. Certainly, we could deal with the alignment and deal with the arthritic component. That might be probably her best operation. Just a realignment without dealing with the arthritic part of her knee probably would not be very helpful.

(*Id.* (emphasis added)).

On December 16, 2014, Dr. Diment noted that Houttekier was "still having problems with her left knee," with "a significant patellofemoral instability problem and arthritis." (Tr. 603). He again observed that the 2013 surgery temporarily worked for her but had "kind of broken down a little bit," resulting in increasing pain. (*Id.*). On examination, Houttekier had crepitus, but was able to get up and down from a chair comfortably and walked without a limp. (*Id.*). Dr. Diment noted, however, that she was "having enough problems that she [was] considering further surgery" – either patellofemoral knee joint replacement or total knee

replacement "if the findings at surgery warrant that." (*Id.*).

On February 18, 2015, Houttekier reported continued pain in her left knee, saying that if she sits or stands in one place too long, her pain increases. (Tr. 599). Dr. Diment noted that she had left knee patellofemoral arthritis with, potentially, a component of instability. (*Id.*). He continued to view surgery as an option if she could not lose weight, or if she lost weight but still had knee pain. (*Id.*). One month later, when Houttekier returned to see Dr. Diment, she reported having recently slipped on some ice while getting out of a car and hit her left knee again. (Tr. 490). She had crepitus with range of motion and mild swelling, but no instability to Varus or Valgus testing. (*Id.*). Dr. Diment's impression at that time was:

> [Houttekier] continues to have symptomatic left knee patellofemoral arthritis. I think, she is at risk to not do well with a patellofemoral joint replacement…. Ultimately, I just do not see this woman going back to gainful employment. She wants to file disability form. I think at this stage that is probably reasonable. With her arthritis, she cannot sit for any prolonged period of time, she cannot stand for any prolonged period of time, she cannot kneel, and she cannot carry things that are heavy. I do not see this getting better over time.

(*Id.*). At a follow-up visit in May 2015, Dr. Diment again noted that Houttekier continued to have crepitus and knee pain and indicated that further surgery was being considered. (Tr. 590). Finally, at a July 2015 visit, Dr. Diment noted that Houttekier was still using a cane for ambulation. (Tr. 586).

Although the record contains no subsequent treatment notes from Dr. Diment, there are references to x-rays and an MRI of her left knee, taken in November 2015 and August 2015, respectively, which were suggestive of "tricompartmental osteoarthritis, worse in the medial compartment with 2 screws in the medial tibial tuberole from the previous elevation." (Tr. 14). In addition, on December 17, 2015, Dr. Diment prescribed a four-wheeled walker with seat for Houttekier. (Tr. 47). And, the records further state that, "As a last resort for pain control,

13

[Houttekier] has been offered a left total knee arthroplasty, which she wishes to proceed with."
(*Id.*). Thus, on January 25, 2016, Houttekier underwent a total knee replacement. (Tr. 14-15).

Considering all of this evidence, the ALJ's decision to discount Dr. Diment's opinion because "deterioration is not reflected in [his] treatment notes" (Tr. 60) is simply not supported by substantial evidence. Thus, the Court cannot conclude that the ALJ adhered to the treating physician rule in discounting Dr. Diment's opinion as inconsistent with his own treatment notes.

### b. Other Reasons for Discounting Dr. Diment's Opinion

The ALJ also erred in discounting Dr. Diment's opinion that Houttekier required an assistive device while engaged in occasional standing/walking (Tr. 544) as inconsistent with his findings that she could get up and down from a chair easily, walked without a limp, had stable Varus and Valgus stress testing, and had a stable Lachman test (Tr. 60 (citing Tr. 490, 590, 599, 603)). In discussing the issue, the ALJ failed to mention Dr. Diment's repeated observations that Houttekier had definite weakness in her left leg (Tr. 607, 620), increasing instability in her patella (Tr. 599, 603, 607, 612, 616), and walked with a cane (Tr. 586, 603, 620, 633, 652). Moreover, other providers – including those who saw Houttekier in the emergency room – noted that she presented with a cane. (Tr. 378). These findings all support Dr. Diment's opinion that Houttekier required an assistive device. Under the circumstances, then, the Court cannot find that the ALJ articulated a "good reason," supported by substantial evidence, for discounting this aspect of Dr. Diment's opinion.

Additionally, the ALJ discounted Dr. Diment's opinion that, if it was comfortable for her, Houttekier should elevate her legs with prolonged sitting, saying that this opinion "appears to be based less on medical necessity and more on the report of the claimant." (Tr. 60-61). Houttekier argues that Dr. Diment's opinion in this respect is "meant to suggest that [she] may be more

14

comfortable shifting positions throughout the day, as evidenced by his note that the duration of her leg elevation would 'vary due to the extent of the swelling' on any particular day, and opinion that she would need a sit stand option[.]" (Doc. #16 at 13 (quoting Tr. 544)). The Court finds this argument persuasive, particularly where Dr. Diment's treatment notes provide further support for this limitation. Indeed, at many visits following Houttekier's June 2013 surgery, Dr. Diment noted that her knee was swollen and painful and that she had a "very heavy" leg. (Tr. 586, 595, 599, 607). All of these findings suggest that, at times, Houttekier would need to elevate her leg, and they were not discussed by the ALJ.[7]

It is also worth noting that Dr. Diment is an orthopedic surgeon who has treated Houttekier consistently since 2011; both of these facts lend additional support to his opinion, and neither was discussed by the ALJ. *See* 20 C.F.R. § 416.927(c)(2)(i), (c)(5).

Given all of the foregoing, the Court cannot conclude that the ALJ gave good reasons, supported by substantial evidence, for giving only "little weight" to Dr. Diment's opinion. Thus, the Court cannot conclude that the ALJ properly applied the treating physician rule or that his decision is supported by substantial evidence. Accordingly, remand is warranted.

## III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [19] be DENIED, Houttekier's Motion for Summary Judgment [16] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks

---

[7] The ALJ also discounted Dr. Diment's opinion as "contradictory in and of itself[,]" saying that his opinion that Houttekier "could not walk and could only stand for less than 2 hours in an 8-hour workday" was inconsistent with his statement that she "would need to walk for 5 minutes every half hour[.]" (Tr. 60 (citing Tr. 543-44)). Again, however, the Court sees no inherent inconsistency in Dr. Diment's opinion that, while Houttekier may not be able to walk a full city block at one time, she did need to stand/walk for five minutes every half-hour (but was still limited to walking less than two hours total in an eight-hour work day).

an award of benefits, and that this case be remanded to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: June 12, 2017  
Ann Arbor, Michigan

s/David R. Grand  
DAVID R. GRAND  
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 12, 2017.

s/Eddrey O. Butts  
EDDREY O. BUTTS  
Case Manager